UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PETER KELMAN,                                    :

                  Plaintiff,               :

   -against-                                    :          <u>COMPLAINT</u>

                                     :

ELLIOT J. BLUMENTHAL,
LAW OFFICES OF ELLIOT J. BLUMENTHAL, PLLC,   :
J. DOUGLAS BARICS, and
LAW OFFICE OF J. DOUGLAS BARICS,             :

                  Defendants.               :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

         Plaintiff, PETER KELMAN, by his attorney, Alexander E. Eisemann, for his

complaint, complains of the defendants and respectfully shows to the Court as follows:

<u>PARTIES</u>

       1.     Plaintiff PETER KELMAN ("Mr. Kelman" or "plaintiff") is a resident and citizen

of the State of Massachusetts, with an address of 500 Unicorn Park Drive, Suite 300 Woburn,

Massachusetts 01801.

       2.     Defendant ELLIOT J. BLUMENTHAL ("Blumenthal") is, upon information and

belief a resident and citizen of the State of New York, with an address of 483 Chestnut Street

Cedarhurst, New York 11516.

       3.     Defendant LAW OFFICES OF ELLIOT J. BLUMENTHAL, PLLC ("LOEB") is,

upon information and belief, a Professional Limited Liability Company organized and operating

under the laws of the State of New York, with an office address of 483 Chestnut Street

Cedarhurst, New York 11516.

4.     Defendant J. DOUGLAS BARICS ("Barics") is, upon information and belief a resident and citizen of the State of New York, with an address of Defendant ELLIOT J. BLUMENTHAL ("Blumenthal") is, upon information and belief a resident and citizen of the State of New York, with an address of 357 Veterans Memorial Highway, Comack, New York 11725.

5.     Defendant LAW OFFICE OF J. DOUGLAS BARICS ("LODB") is, upon information and belief, a separate corporate entity controlled and operated by Barics, through which Barics conducts his practice of law, with an office address of 357 Veterans Memorial Highway, Commack, New York 11725.

## JURISDICTION AND VENUE

6.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1332, 1338 & 1367 based on diversity of citizenship.  The amount in controversy exceeds $75,000.

7.     Venue of this action is properly in this district, pursuant to 28 U.S.C. § 1391(b), on the grounds that defendants conduct business in this district, and because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this district.

## FACTS

### Retention of Meltzer, Lippe, Goldstein and Breitstone, LLP

8.     On or about October 21, 2019, Mr. Kelman executed an engagement letter with the law firm of Meltzer, Lippe, Goldstein and Breitstone, LLP ("M/L") to represent Mr. Kelman in two ongoing matters in the Surrogate's Court of Suffolk County, New York.  One matter pertained to a testamentary trust that his father, Irving Kelman, had established at the time of his death in 1994.  The second matter pertained to the estate of his mother, May Kelman, who had

died in 2018. Both matters were contested and substantial litigation was already taking place with respect to both matters at the time M/L was engaged.

9.    On July 13, 2020, M/L fired Mr. Kelman as its client, with no notice or explanation. During the nine months that M/L represented Mr. Kelman, Mr. Kelman paid his bills to M/L in a timely manner and had paid M/L $25,632.54 before being fired. At the time M/L terminated its relationship with Mr. Kelman, M/L claimed that Mr. Kelman owed it an additional $17,500. *See* **Exhibit 1**, M/L Statement of Account as of July 2, 2020).

10.    After terminating Mr. Kelman as a client, M/L, through its partner Thomas McGowan, informed Mr. Kelman that the firm terminated him as a client for this reason: Mr. McGowan claimed that Mr. Kelman was unfit to be a client, because during the course of the probate litigation, Mr. Kelman had learned that his older brother, Robert Kelman, had concealed from Mr. Kelman, and many other persons, the fact that Robert many years ago had fathered a child while not married and put this child up for adoption. However, this child could be deemed an heir to May Kelman's estate and had to be considered in the proceedings. When Mr. Kelman told his brother Robert that he had learned about Robert's child, Mr. Kelman called the child, in an email, "illegitimate." Attorney McGowan, who identifies himself as a member of the Ancient Order of Hibernians, an "Irish Catholic fraternal organization" (see: www.en.wikipedia.org/wiki/Ancient_Order_of_Hibernians) in his biography on the M/L Internet website, explained that he was so offended by Mr. Kelman's use of the word "illegitimate" that he fired Mr. Kelman as a client. Attorney McGowan stated in court that, in his opinion, no child was illegitimate, and that Mr. Kelman should have used the words "out of wedlock" to describe the child. And for that reason, Mr. Kelman was fired as a client from M/L.

<u>Litigation With Meltzer, Lippe, Goldstein and Breitstone, LLP</u>

11.      On or about November 2, 2020, Mr. Kelman was sued in Nassau County Supreme court by M/L.  M/L filed suit against Mr. Kelman alleging that he owed the firm $30,887.13 for its legal services, plus costs of collection and attorney's fees.  This lawsuit is referred to herein as the "Litigation."  M/L sued for more than the $17,500 it originally claimed Mr. Kelman owed the firm (*see* **Exhibit 1; Exhibit 2 at 1**), on the theory that Mr. Kelman owed the firm for the firm's own attorney's fees, incurred as it was representing itself *pro se* to collect from Mr. Kelman. Ultimately M/L sought to collect over $225,000 against Mr. Kelman for its own attorney's fees incurred in representing itself.  Eventually, after a trial on damages in October of 2023, M/L was awarded $203,464.50, based on an original claim of $17,500. *See* ¶ 41 below.

12.      Prior to that, on or about April 19, 2021, Mr. Kelman had filed an answer raising several affirmative defenses and counterclaims against M/L alleging, inter alia, failure to state a claim, asserting meritless and bad-faith claims, legal malpractice, breach of contract, unfair acts and deceptive practices.

13.      On or about September 13, 2021 the Nassau County Supreme Court, per Justice Steinman, entered an order with respect to the Litigation (the "September Order").  *See* **Exhibit 2**.  In his September Order, Justice Steinman noted that Mr. Kelman had not submitted his opposition papers in proper form.  Although Mr. Kelman had filed a very detailed counter statement of material facts supported by various exhibits, he had not submitted an additional affidavit attesting, under oath, to the facts set forth in the counter statement.  Accordingly, Justice Steinman disregarded Mr. Kelman's counter statement of facts *in toto*, even though the defect he had noted could easily have been cured by filing the identical statement of material facts, with its identical exhibits, again but in the form of a notarized affidavit.

14.     Instead of directing or permitting Mr. Kelman to correct the defective pleading, Justice Steinman harshly dismissed Mr. Kelman's affirmative defenses and counterclaims against M/L and partially granted M/L's summary-judgment motion by finding that Mr. Kelman had breached his agreement with M/L and directing that the matter proceed only with respect to determining the amount of M/L's damages.

15.     As part of the September Order, Justice Steinman also directed that:

(a) Discovery in the remaining issue in the Litigation was to be completed within 90 days (December 12, 2021) of the September Order; and

(b) M/L shall file a Note of Issue on or before December 23, 2021.

16.     On October 11, 2021, Mr. Kelman timely filed a notice of appeal of the September Order.

<u>Representation by Eliot J. Blumenthal, Esq.</u>

17.      On October 20, 2021 Mr. Kelman executed an engagement letter (the "Engagement Letter") with Blumenthal in which Blumenthal agreed to represent Mr. Kelman in the Litigation.  *See* **Exhibit 3**.

18.     Mr. Kelman timely paid Blumenthal in full the $10,000 retainer required in the Engagement Letter.

19.     Blumenthal delayed filing a notice of appearance in the Litigation until November 4, 2021.

20.     For approximately one week prior to executing the Engagement Letter, Mr. Kelman and Blumenthal discussed by telephone the specifics of the Litigation and in particular that fact that Justice Steinman had issued his September Order.  Mr. Kelman informed Blumenthal that Mr. Kelman had filed a notice of appeal of the September Order so Blumenthal

would keep perfecting the appeal of the order in mind as one possible means of achieving the overall goal of having his affirmative defenses and counterclaims reinstated. After discussing the Litigation for about a week, Blumenthal told Mr. Kelman that Blumenthal and his associate, Sam Spirgel, were willing to represent Mr. Kelman and had the requisite talents and skill set to represent Mr. Kelman effectively regarding the issues being tried in the Litigation.

21.     Later in October of 2021, Mr. Kelman once again reminded Blumenthal of the fact that Mr. Kelman had filed such notice of appeal of the September Order. *See* **Exhibit 4**, an email from Mr. Kelman to Blumenthal, dated October 26, 2021.

22.     Blumenthal never responded to Mr. Kelman's email about perfecting the appeal. That would have been a procedurally viable and appropriate method of having Mr. Kelman's defenses and counterclaims reinstated. So would filing a motion to renew Mr. Kelman's opposition to M/L's summary-judgment motion supported by a notarized affidavit setting forth the same facts and exhibits as were in the unsworn counter statement of material facts--or simply by supporting the motion with a revised version of the counter statement of material facts itself in the form of a sworn and notarized document--as the new evidence for the court to consider in the motion to renew.

23.     As is explained below, Blumenthal did not pursue either of those means but, instead, filed a motion without reciting the legal basis for making it. Given the strictness with which Justice Steinman had treated Mr. Kelman's simple failure to have the counter statement of material facts notarized, Blumenthal should have made sure that the motion he was filing was permitted under the CPLR and cited the pertinent CPLR provisions to support it.

24.     At the time Blumenthal was engaged by Mr. Kelman, Mr. Kelman informed Blumenthal that he had conducted only limited discovery in the Litigation.  On November 8, 2021, Blumenthal sent Mr. Kelman an email asking about the status of discovery.  *See* **Exhibit 5**.

25.     As a result of several communications with Mr. Kelman, Blumenthal was aware that more discovery was needed in the Litigation.  Specifically, Mr. Kelman informed Blumenthal that discovery was needed in certain areas, including but not limited to:

a    Discovery regarding the billing practices of M/L;

b    Discovery regarding communications among M/L and other counsel in the probate litigation;

c    The hours and method of practice of David Bamdad, who was the partner in charge of Mr. Kelman's case; and

d    The events surrounding the firm's termination of Mr. Kelman and the roles played by Gary Meltzer and David Heyman, the firm's managing partners.

26.     In a letter he sent to Justice Steinman on November 9, 2021, Blumenthal emphasized to the Court that "significant discovery remains in the case."  *See* **Exhibit 6**.

27.     On December 9, 2021, Mr. Kelman sent Blumenthal an email describing in detail the discovery Mr. Kelman wanted to conduct in the Litigation.  *See* **Exhibit 7.**  Specifically, Mr. Kelman explained to Blumenthal:

I am sure that McGowan is trying to rush this to trial without discovery because he does not want David Bamdad's deposition taken.

We must take that deposition.

Further, it is critical to me that Meltzer turns over all of its communications with other lawyers in the probate litigation matter. Stuff is happening in those cases and Bronwyn Black, the attorney to the public administrator, is getting a lot more power. And I think

she had inappropriate communications with David Bamdad. I want to see all the emails between Bamdad and Black.

Exh. 7 at 1.

28.     The reason this discovery was critically important was to substantiate the allegations of Mr. Kelman's claims of malpractice against the firm and to examine the billing practices of the firm in an effort to prove that the firm's outrageous bills were without merit.

29.     On December 12, 2021, the discovery cut-off for the Litigation occurred.  *See* ¶ 15 (a) above.  Blumenthal never informed Mr. Kelman that there was a discovery cut-off deadline and, as a result, Mr. Kelman never knew there was a discovery cut-off date.

30.     Blumenthal conducted no discovery whatsoever before the deadline and never informed Mr. Kelman that Blumenthal had conducted no discovery prior to the deadline.

31.     Subsequent to sending Justice Steinman a letter on November 4, 2021, Blumenthal failed to communicate with Mr. Kelman about the Litigation.  Because of that, Mr. Kelman was concerned that Blumenthal was not actively pursuing his representation of Mr. Kelman in a diligent, professional manner.  On December 14, 2021, Mr. Kelman sent Blumenthal an email in which Mr. Kelman expressed his dissatisfaction with Blumenthal's failures to communicate with Mr. Kelman about the Litigation and failure to pursue Mr. Kelman's case diligently.  *See* **Exhibit 8**.

32.     On December 9, 2021, M/L filed a motion in the Litigation seeking summary judgment against Mr. Kelman with respect to the fees owed by Mr. Kelman to M/L.

33.    On December 24, 2021, Blumenthal filed a cross-motion in the Litigation seeking to: (a) vacate the Court's Order of September 9, 2021, and (b) striking a note of issue that had entered on the grounds that discovery was not complete.  *See* **Exhibit 9**.[1]

34.    Blumenthal's cross motion did not recite any provisions in the CPLR supporting the cross motion.  He simply made equitable arguments about why Justice Steinman's September Order had been unwarranted and unfair.  Blumenthal should have styled his motion as one to renew or at least as a combined motion to renew and to reargue, *see* CPLR 2221(d), (e) & (f).  As motions to reargue under CPLR 2221(d) must be made within 30 days of the notice of entry of an order (notice of entry here was filed on September 13, 2021), CPLR 2221(d)(3), however, a motion to argue would not have been viable.

35.    A motion to renew on the other hand, may be made at any time but a motion to renew must specifically delineate what new evidence is being submitted in support of that motion.  *See* CPLR 2221(e).  Blumenthal should have prepared a notarized version of the earlier counter statement of material facts by Mr. Kelman and submitted that as supporting evidence with his cross motion and asked the court to consider it as a motion to renew.  Blumenthal blew what may have been the most viable means of trying to have Justice Steinman vacate his September Order striking Mr. Kelman's affirmative defenses and counterclaims.

36.    Failing that, Blumenthal should have taken steps, or at least have recommended to Mr. Kelman that he takes steps, to perfect the timely notice of appeal of the September Order, if Blumenthal had correctly recognized that his own cross motion wasn't legally sufficient.

---

[1]    Demonstrating Blumenthal's carelessness, Blumenthal forgot to file a counter statement of material facts when he opposed M/L's subsequent motion, filed on December 9, 2021, for summary judgment on the remaining damages issue.  *See* Letter to the Court dated May 11, 2022 (NYSCEF No. 118).  Blumenthal filed the counter statement of material facts almost five months after submitting his opposition papers.  *See* NYSCEF No. 117.

Alternatively, he should have recommended to Mr. Kelman that he pursue a parallel appeal in case the court denied even a legally-sufficient cross motion.  After all, Mr. Kelman's filing of a timely notice to appeal and bringing that to Blumenthal's attention was Mr. Kelman's way of making sure Blumenthal considered all the available options, including pursuing the appeal, before Blumenthal took what turned out to be a useless step of filing a legal nullity of a motion.

37.     Per operation of New York Civil Practice Laws and Rules ("CPLR") 1250.9 (a), April 11, 2022 was the deadline for perfecting the appeal of the September Order for which Mr. Kelman had filed a timely notice of appeal on October 11, 2021.

38.     When he filed his legal nullity of a cross motion on December 24, 2021, Blumenthal still had over four months left in which to perfect the appeal or to recommend that Mr. Kelman perfect the appeal or easily to seek an extension of the deadline to perfect the appeal to await the outcome of his cross motion.

39.     Blumenthal, however, failed to take any steps to perfect the October 11, 2021, notice of appeal.  Instead, he let the deadline to perfect it lapse without discussing the consequences of missing the deadline with Mr. Kelman.  Competent counsel would have perfected, or recommended to Mr. Kelman that he perfect, the appeal as well as filing a legally-sufficient motion to renew in the trial court.  Blumenthal incompetently failed to do any of these things.

40.     On August 11, 2022, the Nassau Supreme Court, per Justice Christopher Quinn, denied Blumenthal's cross motion described in ¶ 33 above. Justice Quinn denied each of Blumenthal's requests for relief for the reasons set forth in the following paragraphs.  *See* **Exhibit 10**, Short Form Order of Justice Quinn.

41.     With respect to Blumenthal's request to vacate the September 9 Order, Justice Quinn stated that Blumenthal had cited no procedural authority in the CPLR for bring a motion seeking such relief.  Therefore, Justice Quinn denied that request for relief.

42.     Because Blumenthal had not styled his motion as one to renew, had not specifically delineated a basis for that and, most importantly, had not provided any new evidence in the form of a revised counter statement of material facts upon which to base a motion to renew, Justice Quinn understandably deemed the motion to be one to reargue only, which he found was time-barred:

> Defendant's argument that the September 9th Order misapprehended the law and facts is deemed by the Court to be a motion for leave to reargue.  However, Defendant's motion was filed beyond the 30-day deadline imposed by CPLR § 2221(d)(3) for filing such a motion and therefore must be denied.

August 11, 2022, order at 4 (NYSCEF No. 120).

43.     With respect to Blumenthal's request to strike the note of issue on the grounds that significant discovery remained in the Litigation, Justice Quinn noted that Blumenthal was aware of the discovery cut-off date, and did not request to extend discovery prior to the expiration of the cut-off date.  Therefore, Justice Quinn denied Blumenthal's request to strike the note of issue.  Therefore, Mr. Kelman was prevented from conducting any meaningful discovery in the Litigation prior to trial. Blumenthal should have requested, but unreasonably failed to request, an extension of the discovery deadline prior to the cutoff date.

44.     On August 15, 2022, Blumenthal sent Mr. Kelman an email in which Blumenthal discussed the procedure for appealing Justice Quinn's decisions denying Blumenthal's cross motion.  *See* **Exhibit 11**.  Blumenthal foolishly and incompetently advised Mr. Kelman to wait until a notice of entry of Justice Quinn's decision had been filed by M/L before filing a notice of appeal, when time was of the essence to have these critical rulings reversed before any trial was

scheduled.  A competent lawyer would have advised Mr. Kelman to file a notice of entry himself followed by an immediate notice of appeal, and to try to expedite the appellate process.

45.    In any event, Mr. Kelman reasonably relied on Blumenthal's incompetent advice and his assurance that he would alert Mr. Kelman once a notice of entry had been filed.   Mr. Kelman did not independently monitor something that Blumenthal had indicated he would be monitoring on Mr. Kelman's behalf.

46.    On January 12, 2023, Blumenthal filed his notice of withdrawal in the Litigation. *See* **Exhibit 12**.[2]  Prior to withdrawing, Blumenthal never advised Mr. Kelman that he could file a notice of entry himself, which would have been the prudent and legally-competent action to take so a notice of appeal could have been filed and such appeal perfected prior to the trial on damages.  Because Blumenthal did not file and notice of entry himself and did not advise Mr. Kelman to do that *pro se* prior to Blumenthal's withdrawal, no notice of entry was filed until February 12, 2023, when Mr. Kelman filed it himself, *pro se*.  Mr. Kelman filed a notice of appeal on March 21, 2023.  Because Blumenthal never recommended that the appeal be pursued on an expedited basis, Mr. Kelman believed he would have a full six months to perfect it.

47.    On August 23, 2023, however, however, Supreme Court ordered the parties to trial, which it scheduled to commence on October 5, 2023.  With the trial on damages scheduled to take place long before any appeal could be perfected or decided, Mr. Kelman decided there was no practical reason to try to pursue the appeal prior to trial.  He felt he had no choice but to

---

[2]    As further proof of his carelessness, in his notice of withdrawal, Blumenthal incorrectly identified himself as representing the ***Plaintiff*** in the Litigation, not Mr. Kelman, the ***Defendant***.  Justice Quinn mocked Mr. Kelman about that when he appeared *pro se* to represent himself at the last minute after Blumenthal's withdrawal.  He questioned Mr. Kelman's competence as if he were responsible for Blumenthal's error, and sarcastically asked him if he understood he was the defendant in the case.  It created a terrible first impression, which worked against Mr. Kelman for the remainder of the case.

try the case and then to file a notice of appeal after trial and to raise any issues he would have appealed on an interlocutory basis at the end of the entire case instead.

48.    Had Blumenthal provided timely and competent advice, such as recommending that Mr. Kelman immediately file a notice of entry and notice of appeal, and had also recommended that Mr. Kelman request that the appeal be expedited or that the Appellate Division stay the trial until the appeal had been decided, however, Mr. Kelman would have had another avenue of possible relief from the wrongful preclusion of needed discovery.  Because of Blumenthal's incompetence and inaction, and failure to advise a client who retained him to provide New York procedural and strategic guidance, among other things, Mr. Kelman was left without any defenses or evidence to challenge M/L's plainly overreaching efforts at the trial on damages.  He had to pin his hopes, instead, on trying the case with one hand tied behind his back and/or to hope that a post-trial appeal would rectify all the pretrial rulings that had gone against him and caused him to lose the trial.

49.    On October 5 and October 13, 2023 a trial was conducted in the Nassau Supreme Court before Justice Quinn on M/L's claim against Mr. Kelman with respect to the sole issue of damages.  Mr. Kelman represented himself, *pro se*.

50.    Mr. Kelman was completely prejudiced by the lack of discovery during the trial for the following reasons:

> a    Mr. Kelman had no evidence to enter at trial to refute the hours that M/L alleged its lawyers had spent on Mr. Kelman's case;
>
> b    Mr. Kelman had no evidence to support his allegations that M/L attorneys had padded their hours to increase their billings on Mr. Kelman's case;

c   Mr. Kelman had no evidence to support his allegations that M/L managing partners, David Heyman and Gary Meltzer had told third parties (Geoffrey Menin, Esq., Mr. Kelman's personal attorney) that they were going to make an example of Mr. Kelman for other clients to learn from; and

d   Mr. Kelman had no evidence to substantiate his allegations that M/L attorneys had billed Mr. Kelman for acts they did not perform.

51.    On October 26, 2023, Justice Quinn issued his decision awarding M/L $203,464.50 in damages against Mr. Kelman.  *See* **Exhibit 13**.

52.    Blumenthal and LOEB are alter egos of each other.

53.    Accordingly, all the acts and omission of Blumenthal giving rise to this action were also the acts and omissions of LOEB.

<u>Representation by J. Douglas Barics, Esq.</u>

54.    In August of 2023, Mr. Kelman contacted Barics to assist representing him in the Litigation.  Mr. Kelman learned of Barics through Barics' web site, https://jdbar.com/practice-areas/appeals/, in which Barics represents himself as an expert in filing and prosecuting appeals in Nassau and Suffolk Counties of New York State.  *See* **Exhibit 14**.  At the time, Mr. Kelman was exploring filing an appeal with respect to an interlocutory decision that had been made in the Litigation.

55.    On August 22, 2023, Mr. Kelman executed Barics' engagement letter, in which Barics agreed to provide advice to Mr. Kelman regarding the Litigation and any appeals.  *See* **Exhibit 15**.

56.    Mr. Kelman timely paid Barics the advanced retainer described in the engagement letter, and any and all subsequent invoices Barics sent to Mr. Kelman.

57. After retaining Barics, Mr. Kelman was informed of the trial date in the Litigation. Barics provided Mr. Kelman with advice about the upcoming trial on damages against M/L that was scheduled for a hearing in October of 2023.

58. Even though he never filed a notice of appearance, Barics was materially involved in assisting Mr. Kelman with trial preparation. For example, Barics located an expert on collections law, attorney Frank Napoli, who was an expert witness for Mr. Kelman in the trial.

59. On November 2, 2023, Justice Quinn issued his Decision after Trial. *See* **Exhibit 13** (the "Justice Quinn Decision"). Mr. Kelman immediately informed Barics of Justice Quinn's Decision.

60. Barics advised Mr. Kelman that Mr. Kelman should file a notice of appeal of the Justice Quinn Decision within 30 days of the notice of entry of the November 2, 2023, post-trial Decision. M/L had filed a notice of entry of such Decision on the day it was issued, November 2, 2023. *See* **Exhibit 16**, email from Barics to Mr. Kelman.

61. After some telephone calls and further emails exchanged between Barics and Mr. Kelman, Barics offered to draft the notice of appeal of the Justice Quinn Decision for Mr. Kelman.

62. On November 7, 2023, Mr. Kelman accepted Barics' offer to draft the notice of appeal. *See* **Exhibit 17**, emails between Barics and Mr. Kelman regarding drafting the notice of appeal (the "Notice of Appeal") and reasonably relied upon Barics' agreement to follow through and to timely and properly file the notice of appeal.

63. After Barics offered to draft the Notice of Appeal and after Mr. Kelman accepted Barics' offer, however, Barics ceased all communication with Mr. Kelman. That is to say, Mr. Kelman never heard from Barics again.

64.     On November 13, 2023, Mr. Kelman sent an email to Barics asking for an update on the Notice of Appeal.  *See* **Exhibit 18**.  Barics did not respond.

65.     Mr. Kelman called Barics several times thereafter and was placed in Barics' voicemail.  Mr. Kelman left voicemail messages for Barics asking him to call Mr. Kelman.

66.     Barics did not return Mr. Kelman's telephone calls.  On November 16, 2023, Mr. Kelman sent Barics another email asking about the status of the Notice of Appeal.  *See* **Exhibit 19**.

67.     Barics did not respond to Mr. Kelman's email of November 16, 2023.

68.     As a consequence of Barics' breach of his contract to draft and to file the Notice of Appeal, Mr. Kelman had no alternative but to draft the Notice of Appeal himself.  He faithfully followed the advice Barics had provided, however, which was to file the notice of appeal within thirty days of the November 2, 2023, notice of entry of Justice Quinn's post-trial decision rendered earlier that day.

69.     Accordingly, relying completely on Barics' instructions, Mr. Kelman filed the Notice of Appeal with the Supreme Court in Nassau County on December 1, 2023.  As per Barics' instruction, such notice of appeal was filed within the thirty-day window following the November 2, 2023, notice of entry of the Justice Quinn Decision.

70.     On April 24, 2023, Mr. Kelman emailed the Clerk of the Court of the Appellate Division, Second Department, to ask for confirmation of the six-month date to perfect the appeal stemming from the December 1, 2023, notice of appeal he had filed.  The Clerk emailed back the same day informing Mr. Kelman that the appeal stemming from the December 1, 2023, notice of appeal had been dismissed by order dated February 28, 2024.  The Clerk further informed Mr. Kelman that the Appellate Division, Second Department, does not notify the parties of such

decisions.  She confirmed that Mr. Kelman had received no notification from that court of the dismissal of his appeal prior to her informing him of the dismissal that day.

71.     On February 28, 2024, the Appellate Division, Second Department had dismissed Mr. Kelman's December 1, 2023, Notice of Appeal on the grounds that the Justice Quinn Decision Mr. Kelman was appealing had not been an appealable event.  The Second Department's order stated: "ORDERED that the appeal is dismissed, without costs or disbursements, on the ground that no appeal lies from a decision (see Schicchi v J.A. Green Constr. Co., 100 AD2d 509)." *See* **Exhibit 20**.

72.     Mr. Kelman subsequently determined, only after he had irrevocably lost all his appellate rights as a result Barics' incompetent advice, that Barics had incorrectly and incompetently advised and instructed Mr. Kelman how to file a proper notice of appeal of the Decision of Justice Quinn.  Specifically, Barics had erroneously and incompetently instructed Mr. Kelman to file a notice of appeal within thirty days of the notice of entry of Justice Quinn's *post-trial decision*.  That decision, however, was not an appealable order, as Barics, who held himself out as an expert on New York appeals law and procedures, knew or should have known. It was, in fact, only *the judgment* that was entered after that, on March 15, 2024 (NYSCEF No. 230), that was appealable.

73.     Notice of entry of that judgment had been filed on March 19, 2023. (NYSCEF No. 231).  That meant Mr. Kelman had until April 18 or 19, 2024 (possibly the 19th because notice of entry had been filed on Sunday, March 19, 2024), to file a timely notice of appeal. Because Mr. Kelman did not receive notice that his appeal had been dismissed until April 24, however, he missed that jurisdictional deadline to file a timely notice of appeal of entry of the judgment.

74.     Had Barics properly advised Mr. Kelman, that the post-trial notice of appeal should not be filed until after entry of the final judgment, Mr. Kelman would have followed that advice instead and filed the notice of appeal within thirty days of notice of entry of the judgment rather than the post-trial decision.  Barics had incompetently and erroneously advised Mr. Kelman that he would preserve all his appellate rights if he filed a notice of appeal within thirty days of the November 2, 2023, notice of entry of the post-trial decision, but Mr. Kelman did not know it was erroneous.  Accordingly, Mr. Kelman had no reason to second-guess his own lawyer's direction and no reason to believe he should file yet another notice of appeal after the March 19, 2024, entry of the judgment.

75.     But for Barics' improper, erroneous, and incompetent advice to Mr. Kelman about how to preserve his appellate rights, Mr. Kelman would have had a full opportunity to appeal all the adverse decisions against him in the Litigation.  Both Barics' unjustifiable disappearance after giving Mr. Kelman completely erroneous advice, and the erroneous advice itself, upon which Mr. Kelman reasonably relied, literally cost Mr. Kelman any ability to appeal those rulings.

76.     After learning of the dismissal of his appeal, Mr. Kelman retained attorney George Sava to assist with attempting to vacate the Second Department's dismissal of his appeal.

77.     With the assistance of attorney Sava, Mr. Kelman filed a motion with the Second Department to vacate its order dismissing Mr. Kelman's appeal.  *See* **Exhibit 21**.

78.     On September 13, 2024, the Second Judicial Department denied Mr. Kelman's motion to vacate its dismissal of his appeal.  *See* **Exhibit 22**.

79.     As a result of Barics' malpractice and breach of contract, Mr. Kelman irrevocably lost his opportunity to challenge Justice Quinn's decision.

80.    Had Barics provided competent representation and advised Mr. Kelman properly, Mr. Kelman would have filed a timely and proper notice of appeal after a notice of entry had been filed and would have successfully appealed Justice Quinn's decision and avoided having a judgment for more than $200,000 entered against him.

81.    Barics and LODB are alter egos of each other.

82.    Accordingly, all the acts and omission of Barics giving rise to this action were also the acts and omissions of LODB.

<u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury on all issues raised by the complaint.

<u>FIRST CLAIM FOR RELIEF</u>
(legal malpractice/professional negligence against Blumenthal)

83.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs with the same force and effect as if fully set forth herein.

84.    At all relevant times, Blumenthal held himself out to the general public and to plaintiff as being possessed of the skill and knowledge of the profession of the practice of law.

85.    Upon information and belief, Blumenthal failed to do all things necessary to represent plaintiff properly.  The legal representation given to plaintiff by Blumenthal was erroneous and faulty.

86.    Blumenthal failed to provide legal advice and services consistent with the reasonable professional standard of care within the legal community.

87.    No reasonable attorney, operating under similar circumstances, would have:

(a)  failed to advise the plaintiff about the pros and cons of perfecting plaintiff's notice of appeal of the September Order;

(b)  failed to perfect plaintiff's notice of appeal;

(c) failed, as an alternative to perfecting plaintiff's notice of appeal, to request an extension of time to perfect plaintiff's notice of appeal, pursuant to the provisions of CPLR 1250.9 (b);

(d) submitted a motion to the Nassau Supreme Court without citing an appropriate CPLR provision or setting forth other specific grounds for the relief sought in the cross motion;

(e) failed to file a motion to renew pursuant to CPLR 2221(e), which motion is not precluded by a lapse of time, and to support it with the new evidence that was readily available--a properly notarized affirmation or revised counter statement of material facts;

(f) failed to conduct any discovery in the Litigation, especially after plaintiff had stressed to Blumenthal the importance of conducting further discovery in the Litigation;

(g) failed to request an extension of time to conduct discovery prior to the discovery cut-off date; and

(h) fail to consider other strategies to overturn the Court's September Order, including advising plaintiff to file notices of entry and of appeal forthwith concerning the denial of Blumenthal's cross motions and to ask the Appellate Division to expedite the appeal.

88.    Blumenthal failed to provide legal advice and services consistent with the reasonable professional standard of care within the legal community.

89.    Blumenthal's incompetence and failure to exercise due care was the proximate cause of plaintiffs' damages, as described above.

90.     But for Blumenthal's incompetent legal advice and services, as outlined herein, plaintiff would not have incurred the damages described above, including costs and fees incurred by plaintiff in undertaking remedial action in reasonable attempts to avoid, mitigate and/or recover damages caused by Blumenthal's professional negligence and malpractice.

91.     Blumenthal's malpractice caused plaintiff to suffer damages in an amount to be proven at trial.

SECOND CLAIM FOR RELIEF
(breach of contract against Blumenthal)

92.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs with the same force and effect as if fully set forth herein.

93.     At all relevant times, Blumenthal had a valid and enforceable contract with Mr. Kelman.  Such contract was memorialized in Blumenthal's Engagement Letter with Mr. Kelman. *See* **Exhibit 3**.

94.     In particular, Blumenthal had agreed to represent Mr. Kelman in the Litigation.

95.     Blumenthal failed to do all things necessary to represent plaintiff properly.  The legal representation given to plaintiff by defendant was erroneous and faulty.  Blumenthal failed to provide legal advice and services consistent with the reasonable professional standard of care within the legal community.

96.     Blumenthal was in breach of his obligation to provide those services to Mr. Kelman, that he agreed to provide to Mr. Kelman in the Engagement Letter.

97.     As a result of Blumenthal's breach of his contractual obligation to represent Mr. Kelman in the Litigation, Mr. Kelman has suffered the harm more fully described herein.

98.     Blumenthal's breach of contract caused plaintiff to suffer damages in an amount to be proven at trial.

THIRD CLAIM FOR RELIEF
(legal malpractice/professional negligence against Barics)

99.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs with the same force and effect as if fully set forth herein.

100.    At all relevant times, Barics held himself out to the general public and to plaintiff as being possessed of the skill and knowledge of the profession of the practice of law.

101.    Upon information and belief, Barics failed to do all things necessary to represent plaintiff properly.  The legal representation given to plaintiff by Barics was erroneous and faulty.

102.    Barics failed to provide legal advice and services consistent with the reasonable professional standard of care within the legal community.

103.    No reasonable attorney, operating under similar circumstances, would have:

(a) Advised Mr. Kelman to file a notice of appeal of Justice Quinn's decision, when such a decision was not an appealable event;

(b) Failed to advice Mr. Kelman that he should file a notice of appeal within the thirty-day deadline after notice of entry of the judgment, rather than the decision, of the Supreme Court;

(c) Promised Mr. Kelman that he would draft and file such notice of appeal and then fail to draft it;

(d) Fail to communicate with Mr. Kelman after promising to draft and to file, and then failing to draft and to file, the notice of appeal for Mr. Kelman;

(e) Fail to return any of Mr. Kelman's telephone calls after promising to draft and to file and then failing to draft and to file such notice of appeal;

(f) Fail to respond to any of Mr. Kelman's emails about the status of the notice of appeal after promising to draft and to file it and not indicating whether it had been drafted and filed; and

(g) Fail to inform Mr. Kelman that he was no longer representing Mr. Kelman.

(h) Barics failed to provide legal advice and services consistent with the reasonable professional standard of care within the legal community.

104.    Barics' incompetence and failure to exercise due care was the proximate cause of plaintiffs' damages, as described above.

105.    But for Barics' incompetent legal advice and services, as outlined herein, plaintiff would not have incurred the damages described above, including costs and fees incurred by plaintiff in undertaking remedial action in reasonable attempts to avoid, mitigate and/or recover damages caused by Barics' professional negligence and malpractice.

106.    Barics' malpractice caused plaintiff to suffer damages in an amount to be proven at trial.

FOURTH CLAIM FOR RELIEF
(breach of contract against Barics)

107.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs with the same force and effect as if fully set forth herein.

108.    At all relevant times, Barics had a valid and enforceable contract with Mr. Kelman.

109.    In particular, Barics had offered to draft and to file the notice of appeal of Justice Quinn's decision and attorney Kelman accepted such offer.

110.    Barics failed to fulfill his obligation to draft and to file the notice of appeal.

111.   Barics was in breach of his contractual obligation to provide such agreed upon services to Mr. Kelman.

112.   In his engagement letter with Mr. Kelman, Barics also agreed to represent him on an as-needed basis with respect to the Litigation.

113.   Barics stopped providing assistance to Mr. Kelman in the midst of ongoing litigation when time-sensitive decisions had to be made.

114.   Barics never informed or gave any sort of notice to Mr. Kelman that he was no longer providing legal advice to Mr. Kelman.

115.   Barics was in breach of his obligation to provide services to Mr. Kelman, that he agreed to provide to Mr. Kelman in his engagement letter.

116.   Barics' breach of contract caused plaintiff to suffer damages in an amount to be proven at trial.

<u>DAMAGES</u>

WHEREFORE, plaintiff demands judgment against the defendants as follows:

A.   Damages in the amount of $500,000.00;

B.   Interest on all damages;

C.   Costs, including attorney's fees to the extent permitted by law; and

D.   Such other and further relief as the Court may deem just and proper.

Dated:   South Salem, New York
         April 10, 2025

ALEXANDER E. EISEMANN
Counsel for Plaintiff
20 Vesey Street, Suite 400
New York, New York 10007
(212) 420-8300
aee@eislaw.com